FRANK V. STORRS et al., complainants,

*v.*

JAMES BUTLER GROCERY COMPANY et al., appellants-respondents.

[Decided April 25th, 1924.]

On appeal of Frank V. Storrs.

On appeal from a decree of the court of chancery advised by Advisory Master Stevenson, who filed the following opinion:

"The original bill in this cause consisted of eighteen type-written pages with twenty typewritten pages of schedules annexed thereto. Upon motion by counsel for the defendants, pursuant to rule 59, the complainants were directed to file an amended bill in which each cause of action contained in the original bill should be separately stated and numbered. An amended bill accordingly was filed setting forth five separate causes of action occupying twenty-six type-written pages, with eighteen or nineteen pages of schedules attached.

"On motion on behalf of the defendants the second, third and fifth specifications of causes of action set forth in the amended bill were stricken out. The first specification of a cause of action occupying sixteen typewritten pages, however, was sustained, and the fourth specification of a cause of action, which was not attacked, repeats, by reference, practically the whole of the first specification, and may be considered with it.

"The complainants' complaint, which is thus presented to the court, contains many charges of fraud and willful diversion or misappropriation by the defendants of the assets of the complainants' corporation, which the defendants controlled. All the charges of fraud were withdrawn at the argument. The brief of counsel for the complainants and the draft of the final decree which they have submitted contain no trace of any charge of fraud; the relief which the complainants ask for on behalf of their corporation is based solely upon alleged illegal and *ultra vires* acts, without any charge that those acts were intentionally done in order to injure the complainants' corporation.

"The case which is to be decided can be, I think, readily dissected from the mass of pleadings and evidence, eliminating in particular the charges of fraud which permeate the bill of complaint. The following are the essential facts:

"In 1907 the defendant James Butler was operating in his own name what is called 'a chain' of grocery stores in New York and New Jersey, for the most part, if not wholly, on premises which he leased. There were nineteen of these

stores in New Jersey and one hundred and sixty-two in the State of New York, in which state then and ever since the greater number of stores have been maintained and the vastly greater volume of business has been carried on.

"In 1919, about four months before this suit was commenced, there were four hundred and fifty-five stores in New York and seventy-three in New Jersey.

"In April, 1907, the defendant Butler caused the complainant's corporation, the James Butler Grocery Company, to be incorporated in the State of New Jersey under the General Corporation act, with an authorized capital of $10,-000,000, of which $5,000,000 was in preferred stock and $5,000,000 was in common stock, with a par value of $100 per share. As stated in its certificate, there were five incorporators who subscribed in all for fifty shares, the defendant James Butler subscribing for thirty shares, and his four associates subscribing for five shares each. The objects for which the company was formed are quite numerous. The scope of the prospective activities of the company was quite wide, including particularly the operation of grocery stores in any of the 'states, territories, colonies, dependencies of the United States' and the purchase, holding, leasing and renting real estate useful or necessary for the purpose of the corporate business.

"The certificate of incorporation was signed by the incorporators on April 22d, 1907.

"On the same day, April 22d, 1907, James Butler, with the same four associates, signed a certificate of incorporation under the laws of the State of New York, creating a corporation named 'James Butler,' Incorporated. The objects of this New York corporation specified in its certificate were substantially the same as the objects of the New Jersey corporation. It may conveniently be noted here that the defendant the James Butler Grocery Company will be hereinafter referred to as the New Jersey Corporation, and the 'James Butler,' Incorporated, will hereafter be referred to as the New York Corporation.

"The certificate of the New York Corporation fixed the amount of the capital stock at $50,000, consisting of common stock only, each share having a par value of $100, and the amount of capital with which the corporation would begin business being fixed at $5,000. The $5,000 called for by the certificate of the New York Corporation was subscribed for by James Butler and his four associates, Mr. Butler subscribing for thirty shares and his associates subscribing for five shares each.

"The directors of the two corporations were precisely the same, Mr. Butler obviously having absolute control of both. The two corporations in fact were to be in a very large extent merely an instrument for placing the very extensive grocery business of Mr. Butler in New York and New Jersey under convenient corporate cover. As will appear hereinafter more distinctly, the separation of this great financial interest into two distinct corporations was to most intents and purposes a pure fiction.

"At the meeting of the incorporators for the organization of the James Butler Grocery Company, the New Jersey Corporation, the following resolution was adopted:

" 'WHEREAS, James Butler has offered in writing to sell to this company property as follows: The grocery business conducted in his name, including all leases, stock, fixtures and personal property connected therewith, as shown by the books of account thereof, moneys in bank and all accounts due thereto, and subject to all liabilities of every nature and kind existing against the same, to the date of this transfer, in consideration of the issue of stock of this company to the amount of nine million nine hundred and ninety-five thousand dollars ($9,995,000), par value five million dollars ($5,-000,000) preferred stock and four million nine hundred and ninety-five thousand dollars ($4,995,000) common stock;

" 'WHEREAS, It appears to the stockholders that such property is necessary for the business of this company, and that the same is of the value of nine million nine hundred and ninety-five thousand dollars ($9,995,000).

" 'Resolved, That the board of directors of this company be and they are hereby authorized and recommended to purchase the said property above mentioned for the said price, and to issue said stock in payment thereof.'

"At the first meeting of the board of directors, held on April 25th, 1907, the following resolution was unanimously adopted:

" '*Resolved,* That this company accept the offer of James Butler to sell to this company the property in the resolution of the stockholders passed at the first meeting of the corporation authorizing the purchase, and the board of directors do hereby adjudge and declare that said property is of the fair value of nine million nine hundred and ninety-five thousand dollars ($9,995,000), and that the same is necessary for the business of this company.'

"The resolution of the directors approved the form of agreement to carry out the above-mentioned purchase, and authorized the officers to execute the same and affix the corporate seal.

"Mr. Butler's entire chain of grocery stores in New Jersey and New York, with all the property and good-will connected therewith, was thus transferred to the New Jersey Corporation.

"At a special meeting of the directors of the New Jersey Corporation, held on April 29th, 1907, the following resolution was unanimously adopted:

" 'WHEREAS, The corporation, "James Butler," Incorporated, is ready and willing to purchase from this company the personal property and leases, not including the good-will thereof, connected with the grocery business now conducted under the name of James Butler, and the whole thereof, except the stores in New Jersey, for the sum of seventeen hundred and fifty thousand dollars, to be paid by the issuance of its capital stock of the par value of forty-five thousand dollars and certificates of indebtedness for the balance; and

" 'WHEREAS, Said corporation is ready and willing to pay to this company for the privilege of using the good-will of said business in the territory thereof which it is ready to acquire, a sum equal to ninety-five per cent. of the net profits thereon, to be paid at least yearly.

" '*Resolved,* That this company sell the said personal property and leases upon the terms and conditions hereinbefore specified, and also permit the said corporation to enjoy the good-will of said business. upon the conditions above mentioned; and further

" '*Resolved,* That agreements to carry out the foregoing be prepared and signed by the parties thereto.'

"An appropriate instrument was duly executed transferring the physical assets located in New York from the New Jersey Corporation to the New York Corporation.

"The significant facts to be observed is that a separate instrument was executed by both corporations by which the privilege of using the good-will of the grocery business of the New Jersey Corporation, except in New Jersey, was transferred to the New York Corporation. This instrument makes no mention of the physical assets, but transfers the good-will alone, and provides for the payment 'for such privilege a sum equal to ninety-five per cent. of the net profits' of the New York business, 'said payment to be made at least yearly.'

"It is also to be carefully noted that this transfer of the good-will concluded by a provision to the effect that the whole agreement might be annuled by either party on thirty days' written notice to the other.

"While there is no satisfactory proof of the actual value of the assets turned over by Mr. Butler to the New Jersey Corporation as the price of the $9,995,000 of stock which he received, the indications are very distinct that this was a gross over-valuation. The subsequent sale of by far the greater part of the property for which this stock was issued to the New York Corporation, indicates that the over-valuation of the property which the New Jersey Corporation received from James Butler amounted to at least six or eight million dollars. It may be remarked here that the liability upon this stock to the creditors of the New Jersey Corporation, in case the corporation became insolvent, would be a very serious matter to Mr. Butler.

"The original legal and business scheme is exhibited by the above-stated facts, and especially by the records of the transactions of the directors of the New Jersey Corporation above recited. Upon this state of facts is based one of the two remaining claims for relief of the complainants on behalf of the New Jersey Corporation.

"In order, however, that the whole situation as it existed when this suit was commenced may be fully disclosed, and

the facts may be stated which underlie the second claim for relief, for which counsel for the complainants argue, it may be well at this point to set forth another extraordinary corporate transaction which occurred three years after the New Jersey Corporation had turned over the greater part of its assets to the New York Corporation. What was turned over, as hereinbefore stated, constituted by far the greater part of the assets conveyed by James Butler to the New Jersey Corporation. The schedule of stores in each state from 1907 to 1921 shows that there was an enormous extension of the business and assets of the New York Corporation, while the increase of the grocery assets and business of the New Jersey Corporation was comparatively small. The growth of the New York business at the ratio indicated, it may be surmised, would be impossible or would be greatly impeded if the New York Corporation remained indebted to the New Jersey Corporation to the extent of $1,705,000, and was under contract to turn over to the New Jersey Corporation ninety-five per cent. of its net profits. Unless the New York Corporation borrowed money and thereby merely shifted its indebtedness or turned over assets which the New Jersey Corporation accepted instead of cash, it would be necessary for the New York Corporation, in order to avoid either a default in respect of its obligation to pay over ninety-five per cent. of its net profits yearly to the New Jersey Corporation, or a default in respect of its obligation to pay the indebtedness of $1,705,000 in five years from April, 1907, that the New York Corporation should earn within five years from April, 1907, the enormous sum of $34,000,000.

"The answer alleges, although I do not think that any evidence was taken in regard to the matter, that Mr. James Butler loaned large sums of money to the New York Corporation, and also endorsed large loans from various banks to the New York Corporation, upon which loans from banks Mr. Butler was an accommodation endorser, without any compensation whatever. Without this admission in the defendant's answer it might be surmised, if not inferred, that the New York Corporation, financed as it was and loaded

with indebtedness, could not have credit to the extent of a dollar in any New York financial institution.

"Possibly, it was to meet in a measure the requirements of the situation that the directors of the New Jersey Corporation, James Butler and his associates, on June 6th, 1910, adopted the following resolution:

" 'WHEREAS, An agreement was heretofore made whereby this company granted to "James Butler," Incorporated, the privilege of using the good-will of the grocery business purchased by it from James Butler, Esq., except in the State of New Jersey, upon payment by said "James Butler," Incorporated, of ninety-five per cent. of the net profits of the business at least yearly; and

" 'WHEREAS, Said agreement has ever since been and now is in full force and effect; and

" 'WHEREAS, This company holds ninety per cent. of the capital stock of "James Butler," Incorporated; and ·

" 'WHEREAS, The best interests of both companies have been and will be promoted by said "James Butler," Incorporated, purchasing real estate for the purposes of its business with funds taken out of the net profits of the business.

" '*Resolved*, That this company hereby approves of past use by said "James Butler," Incorporated, and hereby authorizes the further use by the latter of so much of its net profits in the purchase of real estate for the benefit of the business conducted thereby as has been or may, from time to time, in the judgment of its officers, be necessary or beneficial thereto; and that the amount so expended be charged to and against this company as payment under said agreement to the extent of ninety per cent. thereof; and it is further

" '*Resolved*, That the secretary of this company be and he is hereby authorized to execute an agreement between this company and said "James Butler," Incorporated, to modify the aforesaid agreement between said companies in accordance herewith.'

"Although in this case we have nothing to do with the rights, or possible rights, of creditors of either of these corporations, the relations of the corporations with their stockholders only being involved in this suit, nevertheless it is important, I think, to consider briefly the features of this extraordinary corporate scheme. In ascertaining the rights of the complainants as stockholders, we cannot wholly ignore the somewhat puzzling question what was the object of this scheme of corporations in New Jersey and New York, when ordinarily one would suppose that what Mr. Butler, with his chain of grocery stores, wished to accomplish, was the incor-

poration of his entire business with the incidental protection from personal liability. The certificate of the New Jersey Corporation gave it ample power to take Mr. Butler's stores in New York, New Jersey and other states and operate them.

"The evidence gives us no direct information in regard to the governing motive for the establishment of this complex of corporations, but it seems plain that for many purposes the separate corporate existence of these two companies in New York and New Jersey in equity would be ignored, and where the rights of creditors were involved might be treated as a transparent sham. The only suggestion which I recall indicating a reason for the creation of the New Jersey Corporation with James Butler and his four associates as directors, and the New York Corporation with James Butler and his four associates as directors, is found in the answer of the defendants, where the effort is made to meet the charge in the bill that the acquisition of New York real estate, pursuant to the resolution of the New Jersey Corporation, adopted on June 6th, 1910, was fraudulent or illegal and injurious to the complainants as stockholders of the New Jersey Corporation. The answer, after denying the charge of fraud and illegality, alleges 'that the original plan for the incorporation [of the New York Corporation] was to have a company capitalized for a small amount in the State of New York, but with a large permanent indebtedness to remain unpaid indefinitely in order to save the defendant company [the New Jersey Corporation] large profits which otherwise might have to be paid for taxation; that this plan was outlined by competent legal and taxation experts, and is a usual and customary practice of similar corporations of this state operating in other states of the United States.'

"It may be briefly noted that the escape from taxation, the method of which is not disclosed, is evidently only one of the supposed advantages which the originators of this scheme expected to obtain from the fiction of corporate existence apart from personal liability. The New Jersey Corporation, as the evidence indicates, was enormously overcapitalized. Mr. Butler stood liable to contribute, perhaps,

six or eight million dollars in case this vast chain of grocery stores in many states should break asunder and insolvency ensue. The New York Corporation was, as the answer states, 'capitalized for a small amount.' All the assets of the New York Corporation were burdened with an indebtedness of $1,705,000. Furthermore, the New York Corporation was bound by contract to pay ninety-five per cent. of its net profits to the New Jersey Corporation. If the New York Corporation should pay out of its net profits the indebtedness of $1,705,000, it would, as has been stated above, have to earn about $35,000,000 of net profits. The splitting of the property conveyed by the New Jersey Corporation to the New York Corporation into two parts, the physical assets being one part and the good-will another, is one of the most striking, I might say amusing, illustrations of the way in which business projects and corporate fictions are juggled with in this singular scheme. No person of common sense would buy for $1,705,000 a chain of one hundred and sixty-two grocery stores in the State of New York, with the stock contained therein, without also buying the good-will. The day after such a sale the vendor, the New Jersey Corporation, could establish competing grocery stores adjacent, or very near, to each of the stores which had been sold. The fact is that the sale of the stores and their contents, and the sale of the good-will, were simply parts of a single transaction, and the result was that the New Jersey Corporation, on April 29th, 1907, transferred all its New York property, its New York business and its New York good-will, to the New York Corporation, and the consideration was nine-tenths of the capital stock of the New York Corporation, $1,705,000 of debt which, however, was not to be paid, and ninety-five per cent. of the profits of the New York Corporation.

"Whether the scheme which these ingenious legal gentlemen in New York evolved would stand any test applied by creditors is a question which we need not discuss at length in this case. The effort seems to have been to enable the New Jersey Corporation [Mr. James Butler] to get practically

the entire profit from the exploitation of this immense business in the State of New York, if there was a profit, and in case of failure, to stand in as a creditor to the amount of $1,705,000. The clause in the contract relating to the transfer of the good-will of the business permitting either party to annul the contract on thirty days' notice, would permit the New Jersey Corporation, in case the New York Corporation failed in business, not only to come in as a creditor, but to establish its own stores in competition with the New York stores. The situation of advantage which the New Jersey Corporation would occupy in case of the insolvency of the New York Corporation, and the appointment of a receiver thereof, is quite plain. The large indebtedness [$1,705,000] of the New York Corporation to the New Jersey Corporation, which fell due in 1912, would enable the New Jersey Corporation, after that date, to throw the New York Corporation into insolvency whenever it saw fit to do so, with the probable result that it, the New Jersey Corporation, would acquire the assets of the New York Corporation at a price which would subject the creditors of the New York Corporation to an enormous loss.

"It is also worth while to note that it is altogether probable that the devisers of this ingenious scheme contemplated, not only that the New Jersey Corporation would get all the advantages of success in business by the New York Corporation without liability in case of failure, but that Mr. Butler, the holder of more than $9,000,000 of stock of the New Jersey Corporation, would be free from liability as a stockholder to the extent of the gross over-valuation of the property for which his stock was issued. Mr. Butler also might float a few millions of this stock on 'the curb.' The New York Corporation, it will be observed, was capitalized at a very low figure, and the inference is that Mr. Butler and his associates paid $5,000 in cash for the stock for which they subscribed.

"I shall not, however, further discuss the peculiar features of this corporate scheme which, so far as I know, has never been brought to the attention of the New Jersey courts, and

no case, in any other state has been cited in which this subject has been discussed. Whether if the rights of creditors were involved separate corporate existence between Mr. Butler's two companies in New Jersey and New York would be ·recognized; whether New York creditors of the New York Corporation could break through the fiction of corporate existence and make the New Jersey Corporation liable; whether after establishing the liability of the New Jersey · Corporation Mr. James Butler could be compelled to contribute, to the extent of six or eight million dollars, sufficient money to pay the New York creditors—these and other questions are not any part of the case before this court.

· "We have to deal in this case with the rights of the complainants as stockholders of the New Jersey Corporation— their alleged right to compel derelict directors of their corporation to indemnify that corporation against loss on account of illegal and *ultra vires* acts which they have perpetrated or undertaken to perpetrate.

"In the argument of counsel for the complainants, and in the draft of final decree which they submit, embodying the relief which they demand from this court, there are only two claims which are made and which must be considered. All the charges of fraud, diversion of assets by the corporation to subsidiary corporations in New York and loans to favored individuals, have been adandoned. As stated by counsel in the argument, and as set forth in the draft of decree, two claims only remain, as follows:

"*First.* The complainants claim that the defendant directors, James Butler and his associates, should be compelled by the decree of this court to collect the $1,705,000 which they have allowed to remain overdue and uncollected for eight years prior to the commencement of this suit, and stand personally liable for this debt, with interest.

"*Second.* That the defendant directors should be held personally liable to pay to the New Jersey Corporation the ninety-five per cent. of profits which, under the contract of · April, 1907, was due to the New Jersey Corporation, a large part of which was applied under the arrangement of 1910.

to the purchase of real estate in New York in the name of the New York Corporation.

"I find no equitable claim in favor of the New Jersey Corporation in respect of the failure of the directors to collect the $1,705,000 from the New York Corporation.

"All the stock, including every share held by the complainants, was originally issued to Mr. Butler or to his four associates, and all these holders of the entire stock of the corporation participated in, and approved of, the original scheme of April, 1907. All the directors who constituted all the stockholders intentionally formed this scheme, which necessarily involved the indefinite existence of this indebtedness. The idea that any business man would suppose that the New York Corporation out of its own resources, or with the use of its credit, could repay $1,705,000 in five years to the New Jersey Corporation, is simply preposterous. The bill does not set up, nor does it appear in the evidence that the complainants, as holders of this stock, stand in any better situation than that which the original holders occupied.

"If, however, upon any theory a remedy in respect of this transaction could be granted to the New Jersey Corporation at the instance of guilty stockholders, it is sufficient to dispose of the matter, I think, to point out that the complainants do not ask to have the transaction rescinded or declared *ultra vires* and void. On the contrary, they come into court asking to have the bargain enforced. Their complaint is not that the sale was made for the price stated, but that the directors have negligently refrained from collecting the price.

"This leaves the complainants' case resting upon the proposition that the directors are personally liable because they have neglected their duty to collect this money. In my judgment, there is absolutely no evidence to show that stockholders who embarked in the business and corporate scheme disclosed in this case, have any right in equity to complain, because the directors of the New Jersey Corporation did not wreck the entire enterprise and throw the New York Corporation into insolvency by pressing for collection a claim

of nearly two million dollars, which it is manifest that the New York Corporation would be unable to pay.

"Assuming, always, that these stockholders, or rather the stock which they hold, is bound by the participation of all the stockholders in the original scheme of 1907, it seems plain to me that Mr. Butler and his associates, the directors of the New Jersey Corporation, are not shown to have failed in any degree in the exercise of sound discretion in respect of the collection of this very large debt. Where directors of a corporation act in good faith, their discretion in regard to any corporate transaction as a general rule will not be controlled by a court of equity. Courts of equity, in the absence of fraud or other distinct ground for interference, will not expel directors and sit in their seats and determine what should be done or should not be done on behalf of the corporation.

"In considering the fact or fiction of corporate existence, Mr. Butler, the New Jersey Corporation and the New York Corporation, were, to a large extent, practically one thing, viz., Mr. Butler. This fact is illustrated by the disclosure made in the testimony that, after 1915, the New York Corporation, which seems to have been the buying agent for both corporations, charged the New Jersey Corporation the full retail price for all its groceries and other supplies. The accountant, who went on the stand to testify for the defendants, points out that it was a matter of no consequence at what price the goods bought by the New York Corporation were turned over to the New Jersey Corporation, because Mr. Butler owned nearly all of the stock of the New Jersey Corporation and the New Jersey Corporation owned nine-tenths of the stock of the New York Corporation.

"In regard to the transaction of 1910, the case is very different from that which we have been considering, and is involved in difficulties. It is impossible for me to be absolutely certain that in regard to this transaction I have reached a correct conclusion. However, after giving the subject the most careful consideration and study of which I am capable, I have reached the conclusion that there is a

liability from the defendants, or some of them, to the New Jersey Corporation, which is enforcible in this suit. It is easier to establish this liability than to define with accuracy the appropriate remedy.

"The determination of the exact form of relief to which the complainants are entitled requires more care, because of the fact that the New York Corporation is not made a party to this suit. When the defendants applied for an order opening the proofs the court imposed as a condition that, if the complainants would amend their bill making the New York Corporation a party defendant, the defendants should cause the appearance of the New York Corporation to be entered. But the complainants refused to amend their bill so as to make the New York Corporation a defendant.

"It is proved, I might say it is not disputed, that the complainants were without notice of the action of the directors in 1910, concerning which they now complain on behalf of the New Jersey Corporation. It also appears that some of the complainants, at least, acquired their stock prior to the transaction of June 6th, 1910. If I understand the exhibits correctly, the complainant Storrs acquired ninety shares of his stock before the transaction of June 6th, 1910, and the other complainants acquired, at least, a portion of their holdings, if not all, prior to that transaction.

"The effect of the supplemental deal of 1910 between these two fictitious embodiments of Mr. Butler, was that the New Jersey Corporation permitted the New York Corporation to use the ninety-five per cent. of its net profits, which were due to the New Jersey Corporation under the agreement of 1907, for the purchase of real estate in New York in the name of the New York Corporation, and, further, to permit the New York Corporation to charge the amount so expended for real estate 'to the extent of ninety per cent. thereof' as payment of the ninety-five per cent. of net profits under the agreement of 1907. Of course, leaving out of view the small interest of Mr. Butler and his four associates by reason of the $5,000 of stock which they paid for in cash, upon the organization of the New York Corporation, this transaction

of 1910 could hurt no one as long as the two corporations remained solvent and prosperous. Leaving out of view the above-mentioned $5,000 of stock, the certificates of indebtedness for $1,705,000 might have been canceled and surrendered at any time. The full value of such surrender and cancellation would immediately be added to the stock of the New York Corporation, nine-tenths of which the New Jersey Corporation owned.

"Nevertheless, these New Jersey stockholders, subjected, as I think, their rights are to the whole transaction of 1907, in which all the stock of the New Jersey Corporation participated, had a right to have no further transfer of assets from the New Jersey Corporation to the New York Corporation without their consent. They had a right to have the corporate property of the New Jersey Corporation remain subject to New Jersey law. The fiction of separate corporate existence in respect of this matter, I think, must be recognized and enforced. The original stockholders, as we have seen, all agreed that this New York Corporation should take the greater part of the assets of the New Jersey Corporation and exploit them in business in the State of New York, while the New Jersey Corporation would stand, nominally, at least, as a creditor of the New York Corporation to the extent of $1,705,000, and also stand as the holder of nine-tenths of the total authorized capital stock of the New York Corporation, and have ninety-five per cent. of the profits of the New York business. The parties, however, who subsequently acquired portions of the stock of the New Jersey Corporation, never consented to any further transfer of assets from the New Jersey Corporation to the New York Corporation. The New Jersey Corporation, although stripped of perhaps three-fourths or four-fifths of its assets by the transfer to the New York Corporation, still remained the owner and operator of a chain of grocery stores in New Jersey, out of which various liabilities might arise directly affecting the stockholders. Before the transaction of June 6th, 1910, the New Jersey Corporation stood as holder of an indebtedness due to it from the New York Corporation,

amounting to $1,705,000, and it also had the obligation of the New York Corporation to pay to it, the New Jersey Corporation, ninety-five per cent. of the net profits derived from the great chain of groceries operated by the New York Corporation. The directors of the New Jersey Corporation in this situation of affairs practically abandoned this great asset, this right to receive ninety-five per cent. of the profits of the New York business, and permitted the New York Corporation to use the profits which belonged to the New Jersey Corporation for the acquisition of real estate in New York in the name of the New York Corporation. But, further than that, according to this new arrangement of June 6th, 1910, ninety per cent. of the money, the net profits, which in fact belonged to the New Jersey Corporation, but was invested or to be invested in New York real estate in the name of the New York Corporation, was to be credited upon the annual payments equal to ninety-five per cent. of its net profits which the New York Corporation was under contract to pay over to the New Jersey Corporation. The result of the carrying out of this new bargain or arrangement, if the New York Corporation prosecuted its business with success, and acquired hundreds of stores in the cities and towns of New York, would be the cancellation of a very large part of the indebtedness of the New York Corporation to the New Jersey Corporation with respect to the payment of the ninety-five per cent. of profits. This is certainly a strange way to pay a debt—to permit the debtor to acquire property in his own name and have ninety per cent. of the cost of such property credited as a partial payment of the debt. Of course, a consideration of the enhancement by this transfer of assets of the value of the stock of the New Jersey Corporation, which held nine-tenths of the stock of the New York Corporation, and the probability or possibility of a large increase of dividends upon the stock of the New York Corporation, might lead to a practical approval of this plan as a sound business venture not injurious to any right of any individual stockholder of either corporation, provided all the stockholders of the New Jersey Corporation were holders in

the same proportion as between themselves of the stock of the New York Corporation, which, as we have seen, was not the case. About half a million dollars par value of the stock of the New Jersey Corporation had passed from the hands of Mr. Butler and his associates prior to June 6th, 1910, and this amount of stock was, at the time this suit was brought, held by parties who were not stockholders in the New York Corporation. Besides, the stockholders of the New Jersey Corporation were not obliged, without their consent, to have a large part of the assets of their corporation transferred to a foreign corporation and made subject to foreign laws.

"Not the slightest provision is made for reimbursing or in any way paying the New Jersey Corporation for this immense transfer of its assets from the jurisdiction and control of New Jersey to the jurisdiction and control of the State of New York.

"Whatever the purpose of the transfer of assets in fact was, the effect was to enrich Mr. Butler and his associates as holders of one-tenth of the stock of the New York Corporation to the extent of one-tenth the value of the assets transferred, while the complainants, who held no stock in the New York Corporation, would, manifestly, be losers to the extent of about six per cent. of such value. Of course, to the extent that these corporations merely represented Mr. Butler, without any rights of other stockholders or creditors of the New Jersey Corporation being involved, it was a matter of no consequence which corporation held title to perhaps three or four million dollars of assets. But if Mr. Butler and his associates, the directors of the New Jersey Corporation, saw fit to make this great transfer of property for no consideration from their control as directors of the New Jersey Corporation to their control as directors of the New York Corporation, they should have brought in all the stockholders of the New Jersey Corporation, and accomplished their object with unanimous consent. I find nothing in the charter of the New Jersey Corporation which can possibly be construed to authorize this transaction of June 6th, 1910. It stands, it seems to me, very clearly as an *ultra*

· *vires* act, an act in gross violation of the property rights of the New Jersey Corporation, for which the defendants, who were directors at the time, should be held liable. It is alleged that two of the directors took office subsequently to this transaction, and if the evidence shows that such is the case, no personal liability can be established against them.

"While we are dealing with strict legal rights of the complainants as stockholders of the New Jersey Corporation, it is only fair to the complainants to point out that they do not stand before the court as 'strikers.' When Mr. Storrs was on the stand he was sharply cross-examined as to various offers to sell his stock alleged to have been made in personal interviews with Mr. Butler before or shortly after this suit was brought. ‹ The time and place of these alleged tenders were specified by the examining counsel. Mr. Storrs positively denied that he had made such offers. Although there was abundant opportunity, Mr. Butler was not put on the stand by the defendants, nor was the slightest effort of any kind made to substantiate the implications which counsel for the defendant so distinctly made in his cross-examination of Mr. Storrs. The interest of the complainants is comparatively small, but, considered by itself, it is certainly a substantial sum, amounting to four or five hundred thousand dollars in stock of the New Jersey Corporation at its par value. The rights of the complainants as stockholders are substantial property rights entitled to the protection of our law.

"So far as this court is concerned, this case now is narrowed down to the ascertainment of the nature and extent of the liability of some of these directors on account of the *ultra vires* transaction of 1910. In regard to this matter, I think that counsel should be heard fully upon the settlement of the decree. Various views have been suggested to my mind, but the matter naturally has never been the subject of consideration or argument by counsel.

"The situation is unique, so far as my experience goes, in dealing with corporation law and corporate fictions, because we have here a scheme evidently contrived for the accom-

plishment of certain purposes with respect to the evasion of taxation and personal liability, and out of the complex so created spring these claims of stockholders in which creditors and the public seem to have no concern. There is no evidence in the case which indicates that Mr. Butler or his associates have done a single act with intent to defraud the New Jersey Corporation, or the complainants who hold about five or six per cent. of its capital stock. The idea that Mr. Butler and his associates holding at least ninety-four per cent. [$9,400,000] of the capital stock of the New Jersey Corporation, while the New Jersey Corporation holds nine-tenths of the stock of the New York Corporation, would seek to injure either corporation, would seem to be quite visionary. In all this mass of evidence and these charges of fraud and negligence there appears no scintilla of proof that one dollar has been personally appropriated or misappropriated by Mr. Butler. Restitution to the New Jersey Corporation would, to the extent of about nine-tenths, mean restitution by Mr. Butler to Mr. Butler. Under these circumstances, I think, the decree should be framed with the utmost care. This is not a punitive proceeding. Whatever wrongs creditors might have suffered, or whatever evasion of taxation might have been accomplished, none of these things or possibilities are to be considered in this case.

. "The decree in this case may be settled on five days' notice, and thereupon I will give counsel ample opportunity to discuss the question as to the exact form of the decree and the character of the relief which should be granted.    *    *    *

"Upon settlement of the decree counsel for the defendants suggested that the complainant Roach, having voted for the resolution of June 6th, 1910, should be subjected by the decree to the same liability as the other directors. No objection was made to the alignment of Mr. Roach as a complainant at any prior stage of the suit. He is not a defendant and no relief is prayed for against him. The court cannot in this suit, which is brought for the benefit of the corporation, subject Mr. Roach to any decree fastening liability upon him. He has never had his day in court in regard to

that matter. Several defenses can easily be supposed which would protect him, notwithstanding the fact that the minutes of the corporation show that he voted for the resolution of June 6th, 1910, and, as I recall the evidence, voted for the instrument which carried out the resolution.

"Counsel for the defendants made no application to have the bill amended, or for leave to file a cross-pleading praying on behalf of the James Butler Grocery Company for the same relief against Mr. Roach that the original bill prays against the other directors who were made defendants therein. I do not intimate that such an application made for the first time at the very last stage of the cause, the settlement of the decree after the announcement of the decision, would have been granted. Such an application, if granted, would reopen the entire case and cause great delay, inasmuch as Mr. Roach would have a right to file an answer, and also to have a rehearing of the cause so far as he would be concerned. It may also be borne in mind that this suit is brought, not on behalf of Mr. Roach, but on behalf of the defendant the James Butler Grocery Company. Moreover, it is, to say the least, questionable whether the cause of action on behalf of the James Butler Grocery Company, as presented to the court by the complainants' bill, does not have a tortious rather than a contractual basis. This is a matter of great importance when the question for determination relates to the non-joinder as a defendant of one of several joint tort-feasors. However, I do not pause to consider this point, because no application to open the suit and have an amended or an additional pleading filed, praying for the first time for affirmative relief against Mr. Roach on behalf of the James Butler Grocery Company, was made.

"In regard to the defendants, Patrick Mulcahy and James Butler, Jr., it appears that they are clearly innocent of participation in the scheme inaugurated by the resolution of June 6th, 1910. Mr. Mulcahy did not become a director of the company until 1916, and Mr. Butler, Jr., did not become a director until 1919. Other persons became directors after June 6th, 1910, and they are not made defend-

ants. No question of ratification of the original scheme by new directors and participation in the work of carrying it out has been suggested as a basis for liability. Why these two directors, who became such with others long after the scheme objected to was inaugurated, were made defendants is not explained, and no argument has been offered in regard to the matter. Under the circumstances as to them the bill will be dismissed."

WHITE, J. (dissenting).

James Butler and four associates in 1907 incorporated under the laws of New Jersey a corporation called "James Butler Grocery Company," of which they were the directors and sole stockholders, and in the State of New York and under its laws, incorporated a corporation called "James Butler, Inc.," of which they were likewise the sole stockholders and the directors. James Butler then having sold to the New Jersey corporation his chain grocery store business in New Jersey and New York, the New Jersey corporation sold the portion thereof in New York to the New York corporation, receiving in payment therefor $1,705,000 in obligations and ninety per cent. of the capital stock of the New York corporation, the remaining ten per cent. of such capital stock having been paid for in cash by and remaining the property of James Butler and his four associates. The New Jersey corporation also received as consideration for the good-will of the business in the State of New York so sold and transferred by it to the New York corporation a contract that the New York corporation would thereafter pay it yearly ninety-five per cent. of its, the New York corporation's, net profits.

In 1910 the two corporations, by appropriate resolutions passed by their respective directors, modified this ninety-five per cent. of profit agreement so that ninety per cent. of such ninety-five per cent. of net profits instead of being paid to the New Jersey corporation might be invested in the purchase of real estate in New York in the name of the New York corporation, in which corporation, as before stated, the New Jersey corporation owned ninety per cent. of the capital stock, such purchases to be for the extension and enlargement of the

New York corporation's business in that state. This modified arrangement has continued for ten years with highly profitable results, but was, in 1920, objected to by complainants, who have acquired some stock in the New Jersey corporation, and the court of chancery held that in modifying in 1910 the 1907 agreement as to the disposition of profits so that instead of being paid over for distribution among stockholders as dividends they might be invested in the enlargement of the business of the subsidiary company in New York, of which the New Jersey corporation was owner to the extent of ninety per cent. of the whole, the directors of the New Jersey corporation had exceeded their legal authority as directors of that corporation and must now assume or be charged with a personal liability to pay into the treasury of the New Jersey corporation the amount which would have been paid in by the New York corporation if the latter had not, in pursuance of such modification of the 1907 agreement, invested the money in the extension of its business as above set forth.

I think this is error. It will result in the New Jersey corporation receiving from Butler and his associates individually the ninety-five per cent. of the profits of the New York corporation in cash, while at the same time getting the benefit through its ownership of ninety per cent. of the capital stock of the New York corporation of ninety per cent. of the value of the real estate in which such profits were invested, in pursuance of the modification agreed upon. The New York corporation is not a party to these proceedings, although it offered to come in if complainants amended their bill to bring it in, but complainants did not do so. It is impossible, therefore, to do complete justice in the way adopted in the court of chancery. For my own part I have difficulty in understanding how the directors, in providing for the use of *profits* in enlarging the plant and extending the business of a subsidiary company, were committing an act *ultra vires* their authority. The fact that the subsidiary corporation was incorporated under the laws of another state is surely no legal reason for such a view. That would be a strange doctrine to be adopted in New Jersey. The learned vice-chancellor seemed burdened with the view that the di

rectors were disposing of "assets" of the New Jersey corporation, which I think was not so. They were dealing with "profits."

But assuming that complainants have some just ground of complaint because of the ownership by Butler and his four associates of the ten per cent. of the capital stock of the New York corporation, not owned by the New Jersey corporation, the remedy is to declare Butler et al., what they made of themselves in acting as they did as directors of the New Jersey corporation, viz., trustees for the New Jersey corporation of their ten per cent. of the stock of the New York corporation, and to require the transfer of this stock by Butler et al., to the New Jersey corporation, and an accounting by them for any dividends, if any, or other profits received therefrom since the 1910 modification of the profits agreement, in which these gentlemen participated as directors of the New Jersey corporation, and this remedy is now tendered by Butler et al. in their brief. Certainly, complainants have not, by their ten years of silence, earned the right to be paid their share of the ninety-five per cent. of the profits throughout that period, twice.

I am requested by Justice Campbell and by Judges Gardner and Van Buskirk to say that they join in the views herein expressed.

*Mr. George C. Tennant,* for the complainants.

*Messrs. Heyman & Heyman,* for the appellants-respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Advisory Master Stevenson.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, KALISCH, BLACK, KATZENBACH, LLOYD, CLARK, MCGLENNON—9.

*For reversal*—CAMPBELL, WHITE, GARDNER, VANBUSKIRK—4.